IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GOURI S. JHA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-CV-1070-RP |
| | § | |
| ASURAGEN INC., BERNARD F. ANDRUSS, | § | |
| DEBRA THOMPSON, and MISTY | § | |
| MOGFORD, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is Defendants Asuragen Inc. ("Asuragen"), Bernard F. Andruss, Debra Thompson, and Misty Mogford's (collectively, "Defendants") Motion to Dismiss Plaintiff Gouri S. Jha's ("Jha") claims against them. (Dkt. 5). Jha filed a response, Defendants replied, and Jha filed a sur-reply and a Motion for Leave to File Supplement to Sur-reply.[1] (Dkts. 7, 8, 9, 16). Having considered the parties' briefs, the record, and the relevant law, the Court finds that the motion should be granted.

## I. BACKGROUND

Jha, who was born in Bihar, India, was terminated from his job with Asuragen on August 20, 2018. (Am. Compl., Dkt. 2, at 3). Asuragen hired Jha on May 26, 2015, and Jha began his employment as the Senior Director of Information Technology. (*Id.*). He received positive evaluations and was promoted to "Vice President, Information Technology and Dx Software Products." (*Id.*). According to Jha, his employment troubles began in April 2017 when he began reporting to a new supervisor, Bernard Andruss ("Andruss"). (*Id.*). Jha alleges that he then received his only "mixed" performance evaluation in his 2017 year-end review. (*Id.*). Andruss allegedly told

---

[1] Jha filed a motion for leave to file a sur-reply. (Dkt. 16). The Court will grant Jha's motion as unopposed.

1

Jha not to talk with several employees, who may have been on Jha's team, but did not otherwise give Jha substantive feedback about his job performance. (*Id.* at 4). Jha accuses Andruss of targeting Jha and setting "upon a course to remove and replace [Jha] with a Caucasian employee who was a natural born U.S. citizen." (*Id.*). Jha claims the white employees who reported to Andruss "were treated drastically different" and that white employees with performance issues were not disciplined. (*Id.* at 5).

Jha also asserts that Defendants retaliated against him. (*Id.* at 6). Jha recommended that another Indian employee be promoted, and Andruss rejected that promotion "saying that no promotion is done during the mid-year." (*Id.*). Jha later found out that white employees were promoted at that time and "confronted" Andruss about that "wrong doing" and discussed the issue with the Chairman and CTO Matt Winkler. (*Id.*). On Matt Winkler's advice, Jha scheduled a meeting with the CEO, Matthew McManus. (*Id.*). Jha claims that Asuragen's human resources employees Debra Thompson ("Thompson") and Misty Mogford ("Mogford") did not act upon his complaints and instead fired him. (*Id.*). Finally, Jha claims that when his employment was terminated, he was not offered a severance agreement whereas white employees who were discharged were offered a severance agreement. (*Id.*).

Defendants seek to dismiss Jha's claims. (Mot. Dismiss, Dkt. 5). Defendants argue that the parties agreed to submit this dispute to binding arbitration under the arbitration clause in the Confidentiality, Covenant Not to Solicit, & Arbitration Agreement (the "Agreement"). (*Id.* at 1). Defendants contend that Jha was required to read and sign the Agreement as part of his employment with Asuragen and that Jha also received a copy of its employee handbook that "specifically reminded Jha of his agreement to submit all disputes to arbitration pursuant to the [Agreement] and further reminded him that he signed such an agreement at the time of hire." (*Id.* at

3). Defendants also argue that Jha's claims are subject to dismissal under Federal Rule of Civil Procedure 12(b)(6).[2] (*Id.* at 8).

## II. DISCUSSION

"Under the Federal Arbitration Act [FAA], parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). The FAA provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA was designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (internal quotations and citations omitted). Thus, the FAA establishes "a liberal federal policy favoring arbitration agreements" and "requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 97 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Although there is a strong federal policy favoring arbitration, "this federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003). The FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt*, 489 U.S. at 478. Rather, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). The FAA "simply requires courts to enforce privately

---

[2] The Court does not reach Defendants' arguments under Rule 12(b)(6).

negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt*, 489 U.S. at 478.

When considering a motion to compel arbitration, courts apply a two-step framework to determine whether a dispute must be arbitrated. First, the court must determine "whether the parties entered into *any arbitration agreement at all*." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "This first step is a question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 2620 (2018). This initial question is for the court. *Kubala*, 830 F.3d at 201; *see also 20/20 Commc'ns, Inc. v. Crawford*, 930 F.3d 715, 718 (5th Cir. 2019) ("[I]f parties dispute whether they in fact ever agreed to arbitrate at all, such questions of contract formation are considered 'gateway' issues that presumptively must be decided by courts, not arbitrators.") (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)).

To determine whether there is a valid agreement to arbitrate, courts "apply ordinary state-law principles that govern the formation of contracts." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996). In this case, the parties agree that Texas law governs. (*See* Mot. Dismiss, Dkt. 5, at 5–6; Resp. Mot. Dismiss, Dkt. 7, at 9). Under Texas law, a binding contract requires: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." *In re Capco Energy, Inc.*, 669 F.3d 274, 279-80 (5th Cir. 2012).

Jha argues that Defendants fail to establish the existence of a valid, enforceable agreement to arbitrate. (Resp. Mot. Dismiss, Dkt. 7, at 7). Jha contends that he was unaware that an arbitration provision would be a condition of his employment. (*Id.* at 7–8). He explains that his offer of employment did not include an arbitration agreement, and the offer letter stated: "Your position is not governed by any agreements, other than this letter and the Confidentiality Agreement." (*Id.* at 7).

4

Before he started his employment, Jha received the Agreement and claims he was "threatened and coerced into signing" it "in a compressed span of time under threat that his employment would be terminated if he did not sign . . . on the day he started employment." (*Id.* at 9–10). Jha claims that Asuragen "fraudulently induced" and coerced him, when he was "vulnerable," into signing. (*Id.* at 10). To explain, Jha says that if he refused to sign the Agreement, he would lose his job which would "create extreme hardship" for him and his family since he moved to Austin for the job at Asuragen. (*Id.* at 10–11). Finally, Jha attacks the substance of the Agreement as one-sided, lacking consideration, and only signed by one party (Jha). (*Id.* at 11–14).

Jha's attempts to cast the Agreement and Asuragen's presentation of the Agreement as creating an invalid or unenforceable agreement fail. Jha's employment offer letter specifically invokes the Agreement when it refers to the "Confidentiality Agreement." Asuragen simply appears to have used a shortened title to refer to the Agreement—entitled "Confidentiality, Covenant Not to Solicit & Arbitration Agreement." The Agreement also meets the definition of a binding agreement under Texas law: the agreement to arbitrate was part of a larger agreement and both the arbitration provision and the larger agreement were supported by consideration. (Agreement, Dkt. 5-1, at 2–3) ("For good and valuable consideration . . . the Parties agree as follows:"), ("In consideration of Employee's employment with Company, its promises, raises and other benefits paid to Employee by Company, at present and in the future, Employee agrees that any and all controversies, claims, or disputes with anyone . . . arising out of, relating to, or resulting from Employee's employment with Company or the termination of employment with Company, including this Agreement . . . shall be subject to binding arbitration conducted by the American Arbitration Association."). Jha's reliance on several cases is misplaced because the Agreement was neither one-sided, as both parties were bound to arbitrate, (*id.* at 4) ("Arbitration shall be the sole, exclusive and final remedy for any dispute between Employee and Company . . . . Accordingly, neither Employee nor Company will be

permitted to pursue court action regarding claims that are subject to arbitration."), nor illusory because Asuragen did not have the right to modify the Agreement, (*id.* at 5) ("This Agreement may be amended only by a written Agreement executed by the Employee and Company's President.").

Likewise, the Agreement does not fail based on Jha's accusations of fraud and coercion. Asuragen notified Jha of the Agreement and the requirement that he sign it in its employment offer letter to Jha. (Employment Offer Letter, Dkt. 7-1 at 3 ("Your position is . . . governed by . . . this letter and the . . . Agreement."), ("[P]lease read the Agreement and let me know if you have any questions about it. You will need to sign it on the second to last page prior to starting work."). Jha then signed both the Employment Offer Letter and the Agreement prior to starting work and began his employment. (Mot. Dismiss, Dkt. 5, at 6). Jha now claims that he was coerced into signing it under the threat of his employment being terminated, (Resp. Mot. Dismiss, Dkt. 7, at 9); however, Jha was not yet employed by Asuragen when he was asked to sign the Agreement. Asuragen notified Jha of the Agreement with his employment offer letter, sent him a copy of the Agreement, invited him to ask questions, and made clear that his employment was contingent on him signing the Agreement. (Employment Offer Letter, Dkt. 7-1, at 3; Maddox Decl., Dkt. 8-2, at 3–4) ("That same day [that Asuragen emailed Jha his employment offer letter], I sent Jha a packet of new hire materials, including the Confidentiality and Arbitration Agreement, via FedEx. A true and correct copy of the FedEx receipt [shows] delivery [on March 31, 2015]."). Jha then accepted the offer of employment on several days later. (*Id.*) ("Jha returned a signed copy of the Offer Letter on April 2, 2015 and the Confidentiality and Arbitration Agreement . . . on May 26, 2015.").

Finally, Jha points to the fact that Asuragen did not counter-sign the Agreement as evidence that the parties did not intend to be bound by the Agreement. (Resp. Mot. Dismiss, Dkt. 7, at 15–16). He submits a copy of the Agreement that shows his signature, and the Asuragen signature line is blank. (*Id.* at 16). In its reply, Asuragen admits the Agreement is missing Asuragen's signature but

6

counters that a signature is not required if the parties have "assented to the terms stated in an unsigned document." (Reply, Dkt. 8, at 3). In this case, Jha is not claiming that the Agreement does not exist or that he did not sign it. *See, e.g., Trammell v. AccentCare, Inc.*, 776 F. App'x 208, 210 (5th Cir. 2019). Rather, he contends that the Agreement is not valid or enforceable because Asuragen failed to sign it. (Resp. Mot. Dismiss, Dkt. 7, at 15). The mere fact that Asuragen did not counter-sign the Agreement is not dispositive.³ *Carpenter Properties, Inc. v. JP Morgan Chase Bank Nat. Ass'n*, 647 F. App'x 444, 450 (5th Cir. 2016); *Perez v. Lemarroy*, 592 F. Supp. 2d 924, 930 (S.D. Tex. 2008) ("As long as the parties give their consent to the terms of the contract, and there is no evidence of an intent to require both signatures as a condition precedent to it becoming effective as a contract, signatures are not a required factor in the making of a valid contract.") (quoting *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 292 (Tex. App.—Corpus Christi 2003, pet. denied)). Moreover, in general, contracts must be signed by the party against whom enforcement is sought, which is Jha in this case, and he signed the Agreement. *See Perez*, 592 F. Supp. 2d at 931 (finding that arbitration clause could not be invalidated because employer did not counter-sign). The Court thus finds that Jha entered into a valid, enforceable agreement that contained an arbitration clause.

Once a court finds that there is a valid agreement to arbitrate, a court moves on to the second question: whether the claim at issue is covered by the arbitration agreement. *IQ Prods.*, 871 F.3d at 348. In the second step, the Court must determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Webb*, 89 F.3d at 258 (5th Cir. 1996) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). This second question is usually a question for the court, unless the arbitration clause contains a valid delegation

---

³ In addition, Asuragen filed a declaration in support of its reply from its CEO Matthew McManus stating that "Asuragen intended to be bound by the terms of its offer to Jha, including the terms of the [Agreement]." (McManus Decl., Dkt. 8-1, at 3).

clause for an arbitrator to determine whether the claim falls within the arbitration agreement. *Kubala*, 830 F.3d at 202.

Once the court determines that there is a valid arbitration agreement, the strong federal policy favoring the enforcement of the arbitration agreements applies, and all ambiguities must be resolved in favor of arbitration. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). As the Supreme Court has stated: "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers*, 363 U.S. at 582–83).

The Agreement in this case requires the parties to arbitrate all disputes, with limited exceptions. The arbitration clause provides, in relevant part:

> Disputes which Employee agrees to arbitrate, and thereby agrees to waive any right to a trial by jury, include but are not limited to, any claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Worker Benefit Protection Act, the Equal Pay Act, the Federal Labor Standards Act, the Texas Commission on Human Rights Act, the Texas Labor Code, and any common law claims . . . .

(Arbitration Clause, Dkt. 5-1, at 3). Jha brings his employment discrimination claims against Asuragen under Title VII, which is specifically covered by the arbitration clause. (Compl., Dkt. 1, at 5).

Finally, Defendants ask the Court to dismiss this action rather than stay it for the duration of arbitration. (Mot. Dismiss, Dkt. 5, at 9). The Federal Arbitration Act provides that a federal court should stay a civil action upon finding that an issue is referrable to arbitration. 9 U.S.C. § 3. When all of the issues in an action must be submitted to arbitration, a court may (not must) dismiss the action. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *see also Apache Bohai*

*Corp. v. Texaco China*, 330 F.3d 307, 311 & n.9 (5th Cir. 2003) (finding that the decision of the district court to stay the case pending arbitration was not an abuse of discretion). The Court finds that a stay, rather than dismissal, is appropriate in the event that the arbitration fails to resolve the claims. *Steadfast Ins. Co. v. Frost Bank*, No. SA-17-CV-1222-XR, 2018 WL 3865415, at *2 (W.D. Tex. Aug. 14, 2018).

### III. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendants' Motion to Dismiss, (Dkt. 5), is **GRANTED IN PART and DENIED IN PART**. Defendants' motion is **GRANTED** insofar as Jha's claims against Defendants are subject to the arbitration clause in the Agreement. Defendants' motion is **DENIED** as to Defendants' request for dismissal under Rules 12(b)(1) and 12(b)(6). Jha's claims against them are instead **STAYED** pending arbitration.

**IT IS FURTHER ORDERED** that the parties shall file a joint status reports detailing the status of the arbitration proceedings on **February 24**, and every **90 days** thereafter.

**IT IS FURTHER ORDERED** that Jha's Motion for Leave to File Supplement to Sur-reply, (Dkt. 16), is **GRANTED**.

**IT IS FINALLY ORDERED** that Defendants' Motion for Settlement Conference, (Dkt. 23), that was filed subject to their Motion to Dismiss, is **MOOT**.

**SIGNED** on November 30, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE